May it please the court David Bovet appearing on behalf of the plaintiff Robert Norse together with my co-counsel Kate Wells and Mr. Norse is also present in court today and we thank you for hearing our case. We are passionate about our case we've been with it for eight years so it's great to be able to address the court. I'm gonna take 15. Center yourself between the two I'm going to take 15 and I'm going to discuss qualified immunity. My co-counsel will discuss the Monell claim for 10 minutes and then we'd like to reserve five minutes for rebuttal. You have a clock in front of you and I'll keep an eye on it. Please. Well the starting point in this case since it's a public meeting is of course the twin cases of White versus Norwalk and Kinn versus Santa Monica Rent Board and in those two courses in those two cases this court made it very clear that and we don't dispute that a chair of a public meeting has a great deal of discretion to control the proceedings but there was a limitation. May I ask you a preliminary question that's even preliminary to that and that is before you before one gets to the merits I am concerned about the way this all went down. I understand it the district court just said well five days from now I'm going to deal with the issue of summary judgment. There wasn't apparently any opportunity for declarations or anything else to be submitted and I'm not quite sure I mean I take it what he did was look at the videotapes but I'm concerned that that process taints any outcome on the merits whatever the outcome should be and it simply go back and be redone. Did I get a response to that? I understand the court's concern and of course we addressed that in our brief that you know we didn't have the entitlement that we would have in rule 56 for a deliberative process and it's true we didn't know why we're there really. I believe there's a third shot of another round of appeals and I know the record may be less than perfect but I also believe that there's enough of a record here. I'm not even sure what the record is. Well essentially what the record is is the videotape coupled with our offers of proof of what we would produce in opposition to qualified immunity. But those offers wouldn't even be sufficient under rule 56 without a properly authenticated deposition transcript or sworn affidavits of the witnesses so you're asking us to concoct a record on less than what we would accept on a summary judgment motion. Well I I agree with that but I but I also feel that it would be highly prejudicial to the plaintiff to send it back for the judge to have another process. But you argued in your motion that the record is not complete because you didn't have an opportunity to introduce all of that admissible evidence in order to perfect the record. Now I hear you backing away from that position. I'm going to catch 22 here because I really really want this case to be resolved in this court and in this case the next step be a trial. Let me ask you if the videotape were the only evidence to be considered in connection with the merits and or qualified immunity I take it your position would be that that would be insufficient. You would not want to roll the dice or maybe you would. Maybe you can tell us what your view is on that. There are what I would call undisputed facts that are extrinsic to the videotape. For example we know that Mr. Norris was warned about using a Nazi salute in the past. We know that. Before you detail what those might be what's your procedural position? Would you take the videotape plus what you state would be undisputed facts and say that we should then view your other argument as waived as to the procedural defect? I'll tell you what I really think the court should do. That would be helpful. Now that it just occurred to me. I think the court should send this back with a denial of qualified immunity and send it to trial. The defendants never moved for qualified immunity. Never filed a summary judgment motion. As I think the court understands this was an extra legal procedure, not sanctioned rules of Federal procedure. That's not very inconsistent with what I understand Judge Reimer to be suggesting. I hope I'm not mischaracterizing but I think what I heard her asking was given that there was not a proper predicate for grant of qualified immunity because there's no record, isn't the proper course to vacate what the district court did, send it back? Well, send it back for whatever. That's your problem. Your problem is what you would like is to go back and not then have the city bring a summary judgment motion. Right, I don't think they should be allowed to. What was the time, what was the retrial order cut off with respect to summary judgments? Had it passed at that point? Because you were at trial. Yeah, we were on the day of trial. So it had been probably two months or three months before. And I just think it's fair that they, you know, if this case goes back down in the posture where it would be. So just to think it out through, as the current pretrial order, which I guess still governs proceedings, would provide for, there would not be an opportunity for a summary judgment motion to be filed. They could ask for leave or they could ask for an amendment of the pretrial order. But as things stand now in the case, the law of the case is that if there is a remand in the current procedural posture, it would go back for trial. I understand that, Your Honor. But I also think that perhaps what would be fair to us, I think, would be for the court to, in that remand, direct the district court not to entertain a motion for summary judgment. They can, of course, make their arguments post-trial that based upon the evidence produced at trial, there is qualified immunity. But they could make that argument at the close of the evidence before the case was even considered by the jury, couldn't they? Oh, absolutely. Absolutely. And, of course, they can still do that. But we just want to get it to a jury. Well, I understand that. But by your concession, you just acknowledge that you may never get to a jury if the court hears some evidence and decides that qualified immunity attaches. That's right. We're very concerned about that because we see ourselves coming back here again and having to go through this procedure and have this court determine whether there was qualified immunity and then go to trial. And we're getting years and years away. I mean, witnesses' memories must be fading by now. This incident happened in 2002. Fortunately, there is YouTube. There is, but we have that. Can I ask a question about tape or tapes? So far, only the singular has been used. As I understand it, there are two tapes actually in existence, one that's been on YouTube and then the other, I guess, is the official tape made by the city of Santa Cruz. Was either of those in the record? They were. And they were both introduced in the district court? They were. Okay. Well, they were considered, but were they part of the record? They were part of the record. And where would we find that? Exhibits A through D, I believe, is how they were denominated. That did not just include video, but also included some documentation, for example, the city charter and some other things. On to the merits. Okay. Thank you. In White and Kind, this court- Let me ask you this. Mr. Kovacevic, Kovacevic? Kovacevic, thank you. How did I get that wrong? We're sort of in response to a particularly-a question that he thought was particularly unfair or, you know, he didn't have a good answer for. We're here to give us a zig-hai salute. Is there anything I could do about that? Probably. Why is that? Well, we're in a courtroom. And courtroom implicates public policy questions that are quite different from a city council meeting. A city council meeting is a rough and tumble of politics. A courtroom is about justice, fairness. It's about delivering on our promise of due process. How about if Mr. Norris was in the audience now? So let's say that, you know, the lawyers are officers of the courts. I will sort of exclude the lawyers from this. Let's say Mr. Norris or one other audience member, you know, he doesn't like the way things are going here or appear to be going, and in a house stands up, gives a zig-hai salute, and- I would hope that, you know- No, I understand. It's not a question of advice of what we would do, but I'm just wondering, is there any authority to do anything about that? Well, I think disrespecting a court is pretty much enshrined in our contempt of jurisprudence. That would seem to me to be a very offensive- This is the city council versus court line, the executive versus the judiciary? Yes, I think the judiciary- You said a case where somebody said it was all right to give the finger to a police officer. Now, we might be somewhere on one end of the police officer, another end of the court, and the middle of the city council. Who could have said that? I don't know. Well, yeah, Duran is one of the cases that I wanted to talk to you about today, because Duran was a case where the court specifically said that, you know, basically creating some- acting in an indignified manner towards someone is not- is protected by the First Amendment, and the decision not only spoke about the police officers, but talked about public officials in general, people who are sworn in a public role. So Duran is quite apt for that proposition. In this case, at least on the YouTube tape, it went quite beyond the salute. The first thing that happened was some guy was asked to leave, did threaten the mayor on his way out. The lady was at the lectern, didn't stop talking after time had expired, and there was banter back and forth. Finally, she stepped aside. On the way out was when she passed Mr. Norris and had a little conversation, and he did his salute. And a bit after that, Fitzmorris then says, point of order. The mayor is meanwhile looking down, reading. Fitzmorris says, point of order. Mayor looks up. At that point, Norris has come to the lectern and is talking over Fitzmorris. And why isn't that the operative event rather than the salute, which the mayor did not see undisputedly? And so why wasn't coming to the lectern, talking over Fitzmorris, and refusing to step away from the lectern, the disruptive conduct? Officer, stop beating me with that baton, please. That's what he's saying. He's appealing to the council not to be excluded. It was out of time for oral communications. He didn't have a chit or whatever one calls it in Santa Cruz to speak at that point. So why wasn't he so out of order that when the mayor saw that conduct, the mayor could conclude that is disruptive? Well, we don't have any information about the mayor's reasoning process. Well, I know. That's why I rest my case on the process. But I wanted to get your reaction to that arguably reasonable inference. Okay. The Nazi salute itself, we argue, was protected speech. Let's assume that's absolutely correct. Now Fitzmorris is saying he wants Mr. Norris ejected from the meeting after engaging in protected speech. The last thing that happened was his being at the lectern and talking over a council member and refusing to step back. It's true. I mean, that was the next step after Fitzmorris made his motion. And it was the step that immediately preceded the mayor's saying get out of here. And it was the only thing he saw. Right. Well, as you indicated, we can't speculate about the mayor's motives. But what we can say is that at that point proceedings had turned extremely unfair. And it wouldn't be surprising if someone out of the blue told me to leave a meeting, I might do the same thing. I think it's a normal human reaction. And I think it was so compressed in time and so short. He wasn't told to leave before he came up to the lectern and talked over Fitzmorris. True. But he knew it was coming. Well, did he, I forget to tell you, but he could hear what Fitzmorris was saying to the mayor. He was asking Mr. Norris to be removed, correct? Right. Because it was offensive. Can we step back and just, I don't think, I know these aren't the facts, but you said that the Nazi salute is protected speech. But also what we're dealing with is disruption of a public, limited public forum, if you will, where we ultimately characterize it. If it was clear that a Nazi salute in that audience would have provoked disruption because of its highly inflammatory nature in that audience, I'm assuming facts have been brought to the acceptance, but just for the record. Would that then factor into whether or not the salute alone could be considered disruptive? You've been willing to say a Nazi salute in the courtroom, because of its context, would be treated differently. A provocative Nazi salute, not out on the streets of Skokie, but in the context we're talking about, would that be a factor? I think ultimately no. And the reason for that is it brings into play the doctrine of heckler's veto. That also then runs up against fighting words and the like. I understand your point. There's a gradation here, and I'm just curious as to when does a Nazi salute move into unprotected category. For example, suppose it was so provocative in this audience that it led to a violent outburst. Right. Well, I don't think we're in Brandenburg territory, and I don't think there was any advocacy whatsoever, lawless or otherwise. But I did want to point out that this is a counsel who has allowed signs in the room, as long as they were in the back and on the side. And Mr. Norris raised his arm. Now, if you'd been raising a sign, what's the difference, legally speaking, between raising your arm and raising a sign that said Nazi salute on it? I mean, what he did is he was essentially calling the mayor and perhaps other city council members Nazis for excluding speakers. Right. I mean, that was his view, that this was not a fair procedure, but it was a Nazi-like procedure. That was an analogy. And the question, as I understand it, is what if use of that gesture is the kind of thing that would be disruptive in itself or highly offensive? Let's say, for example, the mayor were black, and not Mr. Norris, but somebody in the audience had used the N-word out loud, used the racial epithet, which, you know, this is the audience would find offensive. I think this was on local cable TV, so people watching at home would find offensive. Would that be the same situation? Would that be different? Would he be excluded for using a racial epithet? I think he could if it had disrupted the meeting. But I think we have to get back to that. So if the mayor were German, that would be? I'm sorry? If the mayor were German, then he could exclude him, but? Yeah, it does get a little strange when we get into our national problem in cases involving racism. But I do think that regardless of? Well, let's say it were a woman mayor, and he had, again, not Mr. Norris, but, you know, the audience member had said something, you know, used one of those terms that's highly derogatory, of women. Would that be a basis for excluding him? I mean, would he be communicating his very strong disagreement with the decision and using a gender slur to communicate the depth of his feeling? Well, you know, I think we get to a point where the first, that the expressive quality of such a statement is much diminished in the First Amendment context. Well, let me go the other direction then, away from the N-word or the Nazi salute. What if instead a member of the audience, to express dissatisfaction with how the procedural part of the proceeding is going, instead just used the middle finger? Is that the same as the Nazi salute, or would you have us look at that differently? Well, I think that the Nazi salute is probably more communicative than the middle finger. Because? Because it actually, you know, it imputes fascistic type behavior by city officials, as opposed to the middle finger, which is just, it can mean a number of things. So it's not as coherent a message as the Nazi salute is. Well, if the presider of the meeting felt that for purposes of decorum, that that was undermining the body, would they be permitted to ask the person to leave? No, not in and of itself. Because I think that takes us back to the requirement of actual disruption found in... So if you had a situation here where you had a finger, plus then a person came up to the podium and started talking and they're not supposed to be talking, would that be disruption? It could be, if it impedes the meeting. But that's not our facts. We have a case here where it doesn't impede the meeting. Just to sharpen the net, all of these hypotheticals we've been throwing at you, is your bottom line that unless it provokes, in fact, some kind of disruptive physical behavior, or interruption in the course of the meeting, if it's just a gesture or an epithet or whatever it may be, doesn't have any impact other than provoking maybe the kind of reaction on the dias that the council member did, that that then would be protected and there would be no justification whatsoever for excluding them. I think it's protected unless there actually is a disruption that flows there from... But a physical disruption as opposed to... It doesn't have to be physical. Barring the order and getting people distracted and buzzing. No, it doesn't have to be physical. I think it's enough if it interrupts the flow of the meeting for some significant period of time. What about the first speaker who, when told to leave, basically turns to the council and says, I'll see you on the street, pal? Had he been charged as Mr. Norris was, would that have been protected speech under the first one? If that's all there was to it, I don't think it rises to the level of a disruption. I think we have to be sensible about this and apply common sense, and we don't want to be dragging people to jail for insufficient reasons. Doesn't a see on the street communicate that he might be out there waiting to commit physical violence? It might, but we know this gentleman, and he's quite harmless. And where do we find that in the record? It's not in the record. I mean, it's not in the record. Part of my problem with this case, in a sense, I guess, is Judge Reimer's problem, and maybe all of ours. So much of this is context-specific. That is to say, is a Nazi salute from the side of the room, unaccompanied by any voice from Mr. Norris, disruptive? In Santa Cruz, is this man saying, I'll see you on the street, is that disruptive or threatening? In Santa Cruz, knowing that person. That is to say, some things in some contexts are disruptive and the precise same thing in another context is not at all. How do we deal with the fact that we don't have much of a record, given that that's so? Well, it's a bit of a problem. But I think from this record you can deduce that Mr. Norris did not disrupt the meeting at Mike Hill Council. I was supposed to spend my time with her. Okay, thank you. Okay, thank you. Good morning, Your Honors. Please, the Court. Kate Wells, on behalf of the appellant, and I am here to argue the issues, the Monell issues, in terms of the liability of the city. You know, Monell, the whole point. What evidence is there of any kind of custom and policy? None, right? Pardon? There is no evidence of custom or policy on the part of the city. Evidence of custom or policy. Well, policy can be the decision of a policymaker, and we are talking about the mayor. But you're not arguing that there was an adopted policy of the city or custom of the city? No. What you're arguing is that the mayor's action of ejecting Mr. Norris was making policy for the city. Right. And the case law, including Penbower and Propotnik, St. Louis v. Propotnik, are quite clear in saying that all it takes is one incident, one decision, as long as it is a final policymaker, and we are talking about the mayor. There isn't anyone above him who is going to be reviewing his decisions. Does that mean that anything the mayor does subjects the city to liability because he is the mayor? I would say as long as his decisions are not reviewable by any other source, as long as he is acting sort of within his jurisdiction, which of course he was in this situation in enforcing the rules of decorum. I mean, even the appellee recognized in his brief at page 25 that Crone, as the moderator of the meeting on March 12th, was the only one with the authority to eject the appellant. To review by other members of the council? Yes. Can another council member say, Mr. Chairman, before you eject him, ask that we vote on the proprietary order? That's correct. This is another area where we were severely injured by the fact that the process that happened in terms of not having the opportunity. So can we have a rule on the balance? Well, I'm not saying that. I'm not saying that. I'm just going to tell you that the reason why the record is not as complete as it could be is that the city charter, which contains that little section about the rest of the council appealing, was not provided to us until literally the day before trial. So we didn't have a chance to respond. We could have responded. We had deposition testimony from the mayor himself, who said that he made the rules of decorum. And we would have had that if we'd known, but we didn't have that chance. We'll spend a minute or two talking about the Sergeant-at-Arms, Lorraine Baker. Okay. You may be the wrong council to have asked this question. Yeah. I mean, the mayor says this guy is out of the meeting. Okay? He's the cop. He's been told this is somebody who's no longer allowed to attend this room. What is he supposed to do? He say, no, I'm going to let you stay here? Like I said, this is not the area I came to argue about, but I can address that issue. If you look at the videotape, Sergeant Baker is standing directly across from Robert Norris and looking directly at him when he does the Nazi salute. He also is vested with knowing the laws in terms of I understand all of that, because your time is short. But let's assume that he has read the law and he's read Iran and he's read Congress' California, and he firmly believes that the mayor is wrong in ejecting Mr. Norris. He just thinks that what the mayor did was just not right. Can a police officer, somebody charged with maintaining order in the room, Sergeant-at-Arms, take it upon himself to defy the order of the chair by allowing somebody to stay because he, the officer, believes the presiding official is wrong? I think it's his responsibility to do so. I mean, you know, we're not talking. Once the mayor says, Mr. Norris, you're no longer welcome here, isn't he at that point a trespasser, whether the mayor's order winds up being correct or not correct? At that point, doesn't he become a trespasser by virtue of the ruling? He wasn't charged with trespass. Whether or not he would become a trespasser, I don't know. And it's certainly clear that the mayor could have made a citizen's arrest at the time, in which case Sergeant Baker would have had to have accepted the citizen's complaint. But Sergeant Baker arrested him for trespass, did he not? Interestingly enough, if you look at the full videotape, the one that was done by a private party, you see that Sergeant Baker tells Robert he doesn't know why he's arresting him. But he's going to have to check with the city. But he then mentions the word trespass. Yeah, he does mention trespass. He goes over to the city attorney and consults with the city attorney, comes back, and still doesn't know. Who looks perplexed. Pardon? Who looks perplexed. Totally perplexed. And at that point, he says, I still don't know. And I don't know if you can hear on the videotape, but on the way out the door, you can still hear Mr. Norris saying, what am I being arrested for? But under California trespass law, if, in this case, I guess the mayor, who is in control of the city property, tells someone to leave, and the police officer asks Mr. Norris, you've been ordered to leave, will you leave? And Norris says, no, I'm not going to leave. Isn't that a probable cause to establish a violation of the California trespass statute? Well, like I said, that's not what he was charged with. He was charged with disrupting a meeting. It was a 403 violation. Didn't the district court grant qualified immunity to the officer, finding there was probable cause for the arrest? And are you challenging that ruling on qualified immunity or not? Yes. Yes, we are. And, you know, I recognize the fact that it's certainly more difficult for the officer, being in a situation of having to carry out the orders of the mayor in this situation. But getting back to Judge Kaczynski's question, wouldn't a reasonable police officer, faced with those facts, believe that a violation of law had occurred? And the property owner orders this guy to leave, and he says, I'm not going to leave. And so the officer says, either you leave or I'm going to arrest you. And the guy says, I'm not leaving. What is a reasonable officer to do? Well, again, a reasonable officer, I think, would recognize the fact that the initial request for him to leave was unconstitutional because he did not cause any disruption. Let's say Sergeant Baker had not been in the room. Let's say he had been standing outside the door, you know, for some reason, and the mayor calls him in and says, will the sergeant at arms remove Mr. Norris? I've ordered him removed. So he doesn't know anything about the reasons for the order. Does that change the situation? Yeah, I think it would change the situation. So you think the fact that he observed the incident, and so he had to do this second guess at the mayor's decision? Absolutely. You are out of time. We'll give you a minute for rebuttal. We'll hear from the city now. I'm sorry, I didn't hear. I have a couple more minutes, did you say? On rebuttal. On rebuttal. All right, thank you. We'll see how things go, but we'll hear from the city right now. Thank you. Mr. Kovacevic. Good morning, Your Honors, as well. George Kovacevic for the city. Do you want to start with a question or do you want me to begin? What the district court did here does seem a little precipitous, doesn't it? I'm sorry, Your Honor. What the district court did here, did the district court's action in this case, essentially to engineer a summary judgment hearing when no summary judgment has been moved for, seems a little precipitous. Well, in view of the fact that I asked the court to take the legal action on legal issues first on a motion to bifurcate, I don't see it as precipitous because, to me, if there's undisputed evidence and they could be handled as a matter of law. So you think we should rule as a matter of law here and not? I do, and the reason I do is because I don't quite agree. First of all, if I could just backtrack a little bit. There are two DVD tapes or DVDs that were introduced in the evidence as C and D, and they have referenced material outside of the two incidents that were part of this complaint. They've referenced other incidents where Mr. Norris has spoken. The dissent in this case has also referenced that evidence. I'm not sure from hearing from you as to whether you've seen that, but we did excerpts of numerous appearances by Mr. Norris, and they're cataloged in the beginning page of the DVD by date, and some of those dates have been referenced by all the parties in the previous pleadings here. Let me ask you this. I think I know what you would answer. Are you saying that the so-called YouTube video that was taken by a private party was never introduced in the record below? No, no. Both were. See, one is like this one. What? Both vantage points of the March 12, 2002 incident. One was taken by the city council's own videotaping. The other was taken by a private party associated with Mr. Norris. And both were from the district court. And they were both in there. But I'm talking about there were a wide variety more than that. The ones having to do with statements by council members about the offensiveness of the Nazi salute in previous meetings, the times when Mr. Norris appeared at previous meetings. What's the relevance of the ones that are not in evidence? I'm sorry? Those are not in evidence. No, I'm saying they are in evidence. We had them marked as exhibits C and D in the court record. I've double-checked it many times. Mr. Norris admitted those into evidence. Those two or all of the others? Well, see, you're getting confused because there were two incidents. I'm sorry. Maybe that's why we have summary judgment where we know exactly what the exhibits are and then the other side gets to put in their exhibits and then you get to rebut and then we see if there's an issue of fact. I mean, isn't that the whole point of this record is that it's unclear what the quote record was and we know that there's a whole bunch of what the record wasn't. Well, I'm sorry, Your Honor, but I can't agree with that. All right. Because it was very clear to me what the record was and it seemed to me clear from everybody the way we briefed it and in the way the dissent discussed it in its dissenting opinion. And so that's why I'm not clear as to why. Yeah, but we're talking about what happened to the district court. The district court. Right. But what I'm saying is Judge Toshima couldn't have talked about what he did. He cited the very things I'm talking about. Well, you know, people can talk about all sorts of things. I'm not suggesting that he did it inappropriately in any sense. What I'm saying is what matters is what happened in the district court. Right. But the district court took some kind of action to say, okay, I'm considering this and I don't see a triable issue of fact arising out of this. And the problem is we can't tell what this is, nor can we tell whether there is or isn't a triable issue of fact arising out of it. And I hear that you're having a problem, and I'm having trouble understanding not because this is a criticism. The DVDs themselves contain these outtakes from other events, or they are part of Exhibit C and D, which are referred not just to the DVDs but also to these other aspects. So in all order from the district court. That's what I'm saying. Weren't there outstanding motions in Lemonade with respect to those incidents? No? There was a motion in Lemonade, yes. So how do we know whether the district court actually took that into consideration or didn't? Because he hadn't yet, I think, hadn't yet ruled on the motion in Lemonade to exclude them. But he did omit the exhibits. So that's what I'm going on. So if we look at Exhibit C and D, we'll find two videos as well as outtakes. Correct. And that's with the dates. They're all listed on the face page, the multiple dates, including the dates. Maybe this is the difficulty, or this is my difficulty. When you say that district court admitted the videos, how did that happen? What was the procedure for admitting the videos? Well, towards the end of the arguments at the last day's proceedings, I asked the court to specifically have them marked and admitted, and the court did. When you said marked and admitted, these are the physical CDs? Two DVD discs. DVDs, rather? Yes. Okay. I have a little bit of difficulty understanding that because what you're actually admitting are a series of videos, events that happen at different times, sort of like a series of photographs. And if you're admitting a series of photographs, the way you would do it, you would have each of them authenticated. The witness would say, you know, is this a video of the car that was involved in the accident? And you say, yes, it is. And then you get the next photograph, you say, and is this what the fender looked like? Yes. And, you know, you go through a series. Now, how do you admit a DVD that contains a series of clips that, unless you authenticate each clip? Were there any objections to the evidence? No, and I think that's part of the answer to Justice's inquiry. And the other is, Your Honor, we had been discussing those other ones as part of the debate. Well, are you on a summary judgment or are you on a trial at this point? We're on a trial. I'm sorry? We're on a trial. Are you the plaintiff? How did you get from something that doesn't have a name to trial? There weren't any witnesses, were there? Was the burden of proof preponderance of the evidence or was the burden applied whether there's a triable issue of fact? Was it under cell attacks or was it just an ordinary deal? I'm sorry. That just really lost me. Well, because, as I indicated, and I mean, I have done this in state court. I don't know. I guess it's a little confusing in the federal court. But I asked to buy the name. It's confusing. It doesn't exist. Pardon? It's not just confusing. There's no such animal. I mean, you just don't up and say, oh, gee, I feel today is a good day to decide an issue. And then you just decide it. Well, first of all, I did it previous to that in my trial brief and motions, and I made a motion to bifurcate and to take legal issues first. And the legal issues I was speaking to address are ones that are based on undisputed facts. All right. But if that's true, then there wasn't a trial. Well, it was the first day of trial. I mean, that's the way I heard it. So it was undisputed facts. Who's the plaintiff in this trial? The plaintiff is Mr. Norris. Okay. So on the first day of trial, you put your evidence in in the nature of a summary judgment within the trial. In the nature. So when you put in, you don't need an objection when you plop down exhibits initially on summary judgment. Doesn't the other side get a chance to respond and raise factual issues? Right. Did they have that here? Did they get to bring in witnesses or affidavits at that point? No, not at that point. But they did make offers of proof, and the court at one point said, I'll accept that. I'll accept that. I'll accept that. But what would the court be accepting? The truth of the matter of what they said they would present. And so then what kind of proceeding is that, just if you could help me out? Well, I guess that wasn't it that Mr. Norris said that he could produce witnesses who would say that what he did was not disruptive. And the judge said, okay, I'll accept there are such witnesses. And that ultimately decided the videotape trumped. And so that there was some degree of factual evaluation to the extent that the judge, district judge, decided that what he saw on the videotape was determinative. Well, I guess if you assume that what they proposed as evidence is conflicting, I mean, I don't, you know, the issue is was were the proceedings disrupted. I don't think you need to have a witness that was in the back to say what the videotape shows. I'm sorry? This wasn't a directed verdict. No. There's no jury in panel yet, but essentially what the judge said is, okay, I've now sort of heard what all the proof is going to be. And there's no point in paneling a jury because if you panel a jury, I would tell the jury it has to find for the defendants. There's no issue of fact for them to weigh. Correct? Well, you didn't base it on the undisputed record that you'd introduced pre-trial. You put in exhibits at the hearing, right? That's right. So this wasn't a typical motion for summary judgment. I'm sorry. This wasn't a motion for summary judgment where you put in your affidavits, the exhibits you want to rely on, and there's notice to the other party, and then there's a ruling. You made a motion to bifurcate the trial, which would normally mean that the judge might hear evidence before it. You might have two separate proceedings, but it generally doesn't mean you have oral argument and put in some exhibits at the end and then submit it. It's a very unusual procedure. I clearly see you are taken aback by that. But what I want to come back to myself is that I do believe in principle that if facts are undisputed, the matters are matters of law, that some notice was given. I think due process is the issue here. We were at the point of trial, which these people would have had to have been prepared at that point in time. I did give, in terms of the due process, I think what was it? I forgot to recalculate it, but it's approximately two weeks' notice of what I was intending to do and where I was intending to go and asking the court to go. And so under those circumstances, and the court repeatedly asked, do you agree the tape is the evidence, there's no dispute about what the tape shows? They said no, there's no dispute. So? Why didn't you move for summary judgment on qualified immunity before the time expired for the filing of dispositive motions? You know, I had a reason. And the answer is? I'm sorry, Your Honor, so much time has passed since that point, I can't recapture it. And I probably will after I step out of here. So is your argument now, then, that qualified immunity is different, that it doesn't have to be decided on summary judgment, that if there are no contested issues of fact and because it is a complete defense to the action as opposed to an affirmative defense that must be proven at trial, that the court can grant it any time as a matter of law if it is satisfied that there are no disputed facts standing in its way? Basically, that's what I'm saying. I mean, I know the cases speak that the preferred preference is to have that decided as early as possible, and that's in the interest of the police officer, so that's not hanging over their head. I think that's the rationale. But I don't think it's prohibited to do it at the beginning of trial. Let me ask you this, if I can. I take it that you say you thought at trial, in front of the district court, and you think now that there's enough evidence that's undisputed in front of us that the district court could and we can make up our minds as to whether or not what Mr. Norris did was disruptive, is that right? That's true, although I have a little bit of discussion that I would like to have as to whether the actual disruption needs to occur. Well, okay, but maybe you'll say that in response to what I'm about to say. I have seen the videotape, including the one that shows, not just the one that shows the response by the people up there at the dais, but Mr. Norris raising his hand. I don't think he was disruptive in the least. And your response to that is, if that's my conclusion, what would you say? Well, if you're taking just the Nazi salute, then I think you're wrong in that respect because I think that's all the plaintiff has done and the dissent did is they focused only on that. I think one of the other justices pointed out there's more context to that than just that salute. But let's take that as a given and just focus on that. I think some of the discussion here has raised the issue which I say Kindt didn't really get to, and that is disruption, I think, can be from manner and tone. So, for instance, if I thought you people are too liberal of a court and I started speaking about that and criticizing you in vulgar language, I'm being disruptive. You're listening to me attentively, somewhat attentively, all of you now, and I appreciate that. And you don't look like you're being disrupted. But if I called you S.O.B., M.F., liberal idiots, whatever, whatever, we might be honored. Maybe I'm making the argument in front of the wrong court. I'm making the wrong argument in front of this court. Let me say where I'm driving at with this question is I expect your answer to be when I say, well, what if I looked at it and see it doesn't seem to be disruptive, you're probably going to say, but there are other things that were going on that make it clear that it was disruptive. For example, afterwards he comes up to the microphone, as Judge Reimer pointed out, and maybe that was why he got kicked out, not because of his just simply raising his hand for a few seconds silently. That's my second argument. But I don't want to let go of just the Nazi salute because I sincerely disagree. I think, and that's why I cited Scroggins, which I know is a sub-case, but I would ask you to pay close attention to that again. They said violation of the rules is inherently disruptive. Why do we have our rules? But isn't your argument here, to return, I'm sorry to interrupt you, but basically if we go back to the first memorandum disposition by the panel, it concluded that your position was indistinguishable from Norwalk. And in Norwalk what the panel said is we construe the rules to mean only actual disturbance is covered. Your position is different, as I understand it. Your position is any violation of the rules is a disturbance and there is an actual disturbance. That's not what Norwalk said. I understand that. I'm not arguing with you, but I just want to understand your position. No, you're exactly right. And I'm saying take Norwalk for what it is and we still win. But what I would like you to do is take it further. If I might, the conclusion in Norwalk is that's how the panel justified upholding the ordinance or the policy as facially constitutional. So you're presenting us with a different question. And because we're sitting on Bonk, the facial constitutionality of the rules as you've construed them is probably up for grabs. So why do you think it's facially constitutional? Well, I guess the reason I'm ‑‑ and I understand your point, and if I need to then I'll stick with the disruption interpretation and not open that up. But I really do think for the purposes of my client and probably these kind of boards and council members throughout the country, it's hard to figure out what to do. And I think some of the questions that came earlier were, if you flip the finger or whatever, is that disruptive? And that's the rub that meets the road in the council meeting. And so I don't want to undo something that will jeopardize my client's position here, but I think it needs to be addressed as the Third Circuit has in terms of talking about the threat of disruption as opposed to disruption per se. Let me ask you a little bit differently because this gets kind of into the difference between the Nazi salute and possibly other things. So obviously the Nazi salute here was intended to convey dissatisfaction and some characterization of what they thought was sort of rough justice with throwing people out of talking. What if instead you had a bunch of supporters and everybody's like thumbs up and yay, that sort of thing, and they don't open their mouth, they're just thumbs up. Could that be disruptive? Because they're really all in favor of what's happening. Well, I'm kind of a purist about this, and I would have to say yes. I mean, that's what I'm talking about. So you would characterize the positive or negative, it doesn't matter, just some expression of view about what the council is doing, in your view, could be characterized as disruptive. That's what I would say. Okay. I mean, nodding the head vigorously when somebody's saying something. So in other words, when people are at the council meeting and the chairman is saying, you know, this is like the greatest city we've ever had, I agree with that, and the city council is like the greatest on earth, and so somebody's going like this, they could be thrown out of the council meeting for being boisterous or disruptive? That's a difficult question. That's why I'm asking you. I mean, you told me if I raised my thumbs, I'm in jeopardy of being thrown out. I just want to know, could I nod my head if I were a citizen attendee? You know, I mean, the practical fact of the matter is, Your Honor, that we view as human beings those things differently. Criticisms have an innate nature of being a little more disruptive than something that's favorable. So a thumbs-up is okay, but thumbs-down is not. Thumbs-down is not okay. You can get kicked out for thumbs-down, right? I hear your point about the president of the L.A. Police Convention. Okay? So we've got quite a number of meetings. But it was expected that those meetings, because of their very nature as a citizen oversight body of the law enforcement agency, would have people who would have disagreements. And what I hear you saying is that the president, the mayor, the moderator has to have essentially unlimited discretion to prevent anybody in that kind of form, as opposed to a court in expressing anything that could agitate or get the rhythm of the meeting off-kilter. And I find that a very difficult concept because this is a democracy, and the case law makes these distinctions. And it almost, of course, effects the nature of the proceeding. We risk doing that if a council meeting or a citizen commission meeting has to have absolute civil demeanor so that even the non-verbal kind of activities that you're taking offense at can't be shown. I just don't know how you reconcile that, either with what the nature of your context is in Santa Cruz, or in general as a matter of law. Could you respond to that? Yes, I can. And I understand your question because it is difficult. Because the point is we start with something which is egregious, in my opinion, and I think you might agree, and that is the Nazi salute. And then we start extrapolating from that to less kind of egregious demonstrative behaviors. And at some point, where do you draw the line? That is the difficult issue. And what I don't want to lose focus on is that this was a Nazi salute. But my answer to that is, as Kind says, the solution to that right is in the oral communications. And he, Mr. Norris, has taken full advantage of that. Oral communications, I think the tougher question is, is in oral communications, if someone started using vulgarity and very, very critical, scurrilous language. It's oral communications. There's no subject matter. And he's come in, he's taken good shots at the council members, and they've sat there and they've taken them. They've taken them. They probably didn't like it, but they took them. Because that is the time you have the right to do it. Just like in Kind, this individual could have spoken under chip 13. I don't understand. So if he's standing at the lectern and he's saying, you are a bunch of Nazis, that would be, he couldn't be ejected for that. During oral communications, if that's what he was doing, then yes. Because he is using his mouth. And he has a right to speak on any subject. You're talking about during the designated 30-minute period. That's correct. For oral communications. You're not talking about some broad category of oral communications. So what if he stands there at the lectern, and instead of making an oral statement, he stands at attention, clicks his heels, and gives a zeke heil? That's sort of the message is the city council is like the high star. I think that would probably be okay. We had the council here. Is it okay to give the Nazi salute during a period for oral communication? But if it's outside of that period, you can't do it? Right, because you don't have any right to speak outside. But you're not speaking. What if you wear it on a T-shirt? And it really doesn't do the symbol, but he just wears it on a T-shirt. This council acts like a bunch of Nazis, and they've got somebody showing the salute. Would that also, would you equate that with the hand gesture or not? I assume it would be a different context. He's sitting in there, and he has ten people with these T-shirts on. Is that the same as the hand gesture? Because he's not saying anything. Right. Well, you see, let me put it in this context. If they had a shirt over their T-shirt, and right when Fitzmorris did what he did, they all took off their shirt and exposed it, now that is directly challenging in response. But if they just come into the council, sit in the back there with their T-shirts on. You know, you're digging yourself in deeper. Well, let me just go back to my question, which was about the salute. Yes. And do I really understand you to be saying that if you get up to the microphone, and it's during the period for speaking, and you then make the salute, it's okay, even though you're not speaking? No. It's a physical gesture. It's okay as long as you could have been speaking. Well, that's where, I mean, what I want to tell you is that's where I think manner and tone comes into effect. No, there's no tone. No tone. You just make a physical gesture, but it's when you're at the microphone, when you're supposed to be speaking. Yes. In your speech, you stop, you go like that. It's okay because it's in the period for speaking. Well, that could be an argument. Well, I thought that's what you said, isn't it? Well, I don't want to accept it, but it may be the logical conclusion, and that's, in fact, what Mr. Norris has done in the past, and he hasn't been ejected. That's all I can tell you. So the only reason he's disrupting the meeting is because he's in the back of the room. He's on the side. Instead of being at the microphone during the period. It would not have disrupted the meeting for him to do the same thing if he were in the front, and it was a period for speaking. Your Honor, I hope you understand what I'm saying here. I understand the words, but I don't understand. There are periods of time that no one has a right to speak. Just like now, no one here has a right to speak except me. Yeah, but I'm just asking about the point. And that's when he did this. That's when he did this. So that's what's disruptive about the conduct. Yes. Because it wasn't during the period. It wasn't the fact that it was a Nazi salute. It could have been anything. Right. He couldn't speak about anything. What if he got up and left? You know, the council, the mayor makes a point, and he stands up and stalks out. And the punishment is he has to come back in. We're changing course here. You've got to come back. At the door, he says, well, never mind. I'm going to stay after. I mean, this is an extreme position you're taking, that whatever you do in the audience, if it's communicative, can be punished. Whereas if he walks in, let's say he walks in prepared for a statement. He's gone to a costume shop. He's got a Nazi uniform. He's got the shine boots. He's got the Storm Trooper helmet, the SS insignia and all that. He takes his place. I'm giving him ideas. He's going to do this next. He says nothing, and he just does a sharp clicking of the heels and the zigzag, and then walks away. Perfectly fine. But the guy in the audience holds up a sign or gives a thumb down, he can be ejected. I guess what I've been trying to say is that there is a period for all communications. There's technically no limit on that. Now, whether you can regulate vulgarity, absolutely scurrilous personal attacks. Yeah, sure, if he moans the city council, you could probably get him for public nudity or something of that sort. But what you want to do is the distinction is between the idea of communicating. If you communicate an idea that's sufficiently offensive, not that somehow the idea is sufficiently offensive to disrupt the meeting, then that could be a basis for ejection. That's really what you want to say, if what you're communicating is an idea that's sufficiently offensive. No, what I'm saying is if you're communicating when there's no right to communicate, therefore you have no right to speech, therefore there can be no violation. So your position is that an audience in a public meeting under the Brown Act has no right to communicate, either by gesture or by smile, by hand gesture, by anything else. They are like statues. Right? That's how you understand the Brown Act to operate. That's not the real world, but I do think that is technically the parameters. I thought you had said to Judge Talman, however, that you could bring in signs. Is that true? Well, the council has a separate policy to bring in signs. That's why I'm trying to understand the rules, because we're now back to the real case. And what if the sign had a soldier giving a Hitler salute? Would that be okay under the council's policy? I thought of that about seven years ago. Did you do it? Try it out? Unfortunately, the council opens themselves up when they allow that kind of a sign policy, but my point here is he's not within the sign policy. He doesn't have a sign. The signs come and they sit there, okay, in the back of the room. They're not there with respect to that specific statement or that specific event. So if he sits there, it matters whether he stands or sits? Where he sits. If he's in the back, he's okay, but he can't do it up front. Right. Well, I know they can't parade back and forth. I know there was a problem with that. Can you move the sign? I'm sorry? If somebody does something you don't like, can you lift up the sign that says that has the Nazi on it? Or turn it from, you know, the back is blank? You know, like a Bollywood sort of boo-yay kind of sign? I know exactly what you're saying and where you're going, but we can't lose sight of the fact that that isn't all that happened here. But I think what you're saying is it's okay if it's a supportive sign. It's not okay if it doesn't support the council. And isn't that just classic viewpoint discrimination? I can understand the motivation, but isn't that what you're really saying? That is not what I'm saying. So how do you explain the answer? We shouldn't have a sign policy, first of all, but they do. No, but I mean, I just don't understand your answer that a thumbs up is okay and a thumbs down is not. But what I said, Your Honor, is I said I'm a purist. I said no to all of it. But I said, practically speaking, you know, human beings, the nature in which they are. Have you thought of running for city council? I'm sorry? Have you thought of running for city council? You don't have an answer. Thank you. Allow me to take this. Your Honor, this time. Thank you. Yes. Can I just leave you with the comments over here with respect to the Sergeant-at-Arms? I mistakenly didn't include 602.1 of the Penal Code, which is the trespass that would apply here. And I think there's probable cause for that as well. And lastly, if I could ask, and I don't mean to suggest it, but if you're inclined to remand this back, I would beseech you to maybe rule on the Sergeant-at-Arms, but also give some better parameters here in view of all the nuances that we've discussed and I think the difficulties with which the trial courts and people like my client deal with every day or every meeting they're involved in. So thank you very much for your time. Thank you. One minute. Thank you. This is going to be very short, obviously. I can assure you of that. I think this artificial distinction between oral communications time and the rest of the meeting does not make sense in light of the policy allowing signs to be up for the duration of the meeting. This was a much ---- That is their rule. I'm sorry. That is their rule. That is their rule. I mean, is that what you're at heart? Disturbed about? No, but that was what counsel had talked about. And I just would tell the court that there's no material distinction between what Mr. Norris did and having these signs in the council chambers on the side and in the back. That would be the only thing. This is the first time I've heard that he may have violated a criminal statute, 602.1. I haven't looked at the statute. California's trespass statutes are very complicated. But this is a public meeting, and it does have a different aspect than if he were in a store and they didn't want him to stay in the store. Thank you. Okay. Thank you. Cases and arguable stands submitted. We are adjourned.
judges: Hearing Panel: Schroeder, O'scannlain, Tashima en Banc Panel: Kozinski, Reinhardt, Rymer, Thomas, McKeown, Fletcher W. , Fisher, Gould, Berzon, Tallman, Clifton, Bea